## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
EDWIN RUA,                              )
                                        )
       **Plaintiff,**                  )
                                        )    **Civil No.**
       **v.**                         )    **10-40251-FDS**
                                        )
**GUY W. GLODIS, OFFICE OF THE**        )
**SHERIFF, THOMAS PATNAUDE, KATHY**     )
**WISNIEWSKI, UNNAMED DEPUTIES,**       )
**UNNAMED MEDICAL STAFF, and**          )
**UNNAMED SECURITY STAFF,**             )
                                        )
       **Defendants.**                 )
_____)

## MEMORANDUM AND ORDER ON MOTIONS
## FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This action is brought by a state prisoner for alleged medical malpractice and substandard prison conditions, arising out of injuries he suffered in a motor vehicle accident while being transported in custody. After the accident, plaintiff Edwin Rua contends that he was treated by defendants Thomas Patnaude, M.D., and other medical staff. The complaint alleges that Dr. Patnaude and defendant Guy Glodis (who was then the sheriff and who oversaw the Worcester County Jail and House of Corrections) are responsible for his injuries. It asserts claims under 42 U.S.C. §§ 1983 and 1985 for violating and conspiring to violate Rua's rights under the Fourth, Eighth, and Fourteenth Amendments and under state law for breach of fiduciary duty and intentional infliction of emotional distress.

Defendants Glodis and Patnaude have separately moved for summary judgment. For the reasons set forth below, the motions will be granted.

# I.    Background

Unless otherwise specified, the following facts are undisputed.

## A.    Factual Background

On March 20, 2008, Edwin Rua was arrested and then held as a pre-trial detainee in the Worcester County Jail.  His medical entrance examination report stated that he had a history of drug or alcohol abuse, that he had last used heroin two days before, and that he complained of being "dope sick" but that he had no injuries or chronic medical conditions.  (Patnaude Mem., Ex. C at 2).[1]  He was placed on suicide watch for close observation during his detoxification. (Rua Mem., Ex. E).  According to Rua, he felt ill and vomited during the withdrawal period and he remained on suicide watch for seven to ten days.  (Rua Dep. at 40, 43).

On July 25, 2008, while Rua and another inmate were being transported in a Sheriff's Office van to the Lawrence District Court, the driver of the van suddenly applied his brakes.  As a result, the other inmate slid into Rua, both hit the wall of the van, and they fell to the floor. Rua testified that his head hit the side of the van, knocking him unconscious.  He also testified that he was yelling and screaming for the vehicle to stop.  (Rua Dep. at 45, 77-78).  The driver continued on to the courthouse, from where Rua and the other inmate were transported to Lawrence General Hospital for medical treatment.  Rua previously had been in two or three motor vehicle accidents.  (Rua Dep. at 18).

At the hospital, Rua complained of pain in his head, face, neck, spinal cord, left chest, shoulder, left knee, and left lower leg.  Doctors examined him, conducted multiple tests, and provided intravenous morphine and Torodol for pain.  CT scans revealed no injury to his head,

---

[1] At his deposition, Rua indicated that he was using opiates in pill form, not heroin.  (Rua Mem., Ex. F, Rua Dep. at 34).

spine, or back; x-rays of his left clavicle, left shoulder, left ribs, left knee, left leg, left ankle, or

spine revealed no injuries.  The hospital discharged him into police custody with a prescription

for ibuprofen and instructions to follow up with a primary care physician.  According to hospital

records, Rua moved his extremities freely during the x-ray examination and was "laughing and

smiling" at discharge.  (Glodis Mem., Ex. 2 at 22).

Rua was returned to the jail.  Records of the Sheriff's Office indicate that a medical staff

member placed him on medical watch.  (Glodis Mem., Ex. 3 at 4; Patnaude Mem., Ex. E at 3;

Compl., Ex. D).  However, Rua contends that he was placed on suicide watch, in which he

allegedly had no mattress or blanket, toiletries, or books, was afforded no recreation time, and

was exposed to light 24 hours per day.  (Rua Dep. at 48; Rua Mem., Ex. L, Rua Aff. ¶ 2; *see*

Glodis Mem., Ex. 4, Glodis Dep. at 32:16-33:21 (describing suicide unit as "cold," "with a light

on," and having a bed with no box spring)).  Prison records note that Rua complained of achiness

in his neck and back, as well as nausea, dizziness, and headache; that he asked for pain

medication; that his gait was within normal limits; and that he was oriented.  (Glodis Mem., Ex.

3 at 4; Patnaude Mem., Ex. E at 3).  He was given Motrin for five days.  Rua testified that Nurse

Pam Jones crushed his medications, causing him to have difficulty ingesting them.  (Rua Dep. at

133).  He also testified that after he was released from medical watch or suicide watch, he was

held in segregation for one day before being released into the general prison population.  (Rua

Dep. at 50).

On an undated medical request form, Rua complained of pain in his back and head.  On

August 20, 2008, he was given Tylenol.  On August 21, he filed another form complaining of

pain in his head, hip, and leg.  On August 28, Dr. Thomas Patnaude provided him Naproxen for

pain. According to Dr. Patnaude, that was the first hands-on treatment he provided Rua. He had, however, discussed the case with the nurses on the day of the accident and formulated a treatment plan. (Rua Mem., Ex. I, Patnaude Dep. at 52).

In addition to providing direct care to inmates, Dr. Patnaude was in charge of all medical care at the Worcester County Jail. (Patnaude Dep. at 18). He estimated that he was present at the prison four days per week and that he saw Sheriff Glodis there two to three times per week. (*Id.* at 65-70).

On August 28, 2008, Rua filed another request for medical services, complaining of pain in his head and back, pressure in his chest, and a broken tooth. On September 5, he again requested medical attention, complaining of pain in his head and legs, dizziness, and hot flashes. On September 7, he was evaluated by a nurse. On September 23, he filed another request, describing pain in his head and back. On September 25, Dr. Patnaude prescribed Meclizine for dizziness and Parafon Forte, a muscle relaxant and pain medication.

On October 1, 2, and 5, 2008, Rua filed three medical services request forms, stating that he continued to experience pain, that the prescribed medications did not relieve that pain, and that he had difficulty sleeping. On October 5, a nurse evaluated him and referred him to a doctor. On October 20, Dr. Patnaude altered his medication from Naproxen to Ultram and referred him to Saint Vincent Hospital for an MRI of his lumbar spine. The MRI, taken on October 29, revealed a mild compression deformity at T12-L1 and L1-L2 but no major abnormalities. Generally, once the prison received an external medical report, such as an MRI, a nurse would explain it to the inmate. (Patnaude Dep. at 64). However, according to Rua, he did not learn the results of the MRI until December 5.

Rua continued to report persistent pain, filing medical services request forms on November 29 and December 6, 2008. A nurse evaluated him on December 6 and referred him to a doctor. On December 16, Dr. Patnaude referred him to neurologist Dr. Thomas Mullins at Saint Vincent's Hospital.[2] At the January 16, 2009 evaluation, Rua described pain radiating from his left buttock to hip and in his shoulder and collarbone, discomfort in his hamstring tendons, fatigue in his lower legs, difficulty standing and walking, and numbness along his left lateral thigh. Dr. Mullins concluded that there was no evidence of lumbar radiculopathy and diagnosed meralgia paresthetica.[3] He explained that the condition would improve with time, but that "in the meantime he'd simply have to live with it." (Patnaude Mem., Ex. L at 3). He also recommended that Rua stretch and ordered hip x-rays "for completeness." (*Id.*). X-rays of Rua's pelvis and hips performed on March 19, 2009, showed no abnormalities or fractures.[4]

On March 30, 2009, Dr. Patnaude referred Rua to an orthopedic clinic at Saint Vincent's Hospital for pain management. On May 19, 2009, he was examined by Dr. Alberto Cabantong. Dr. Cabantong noted that Rua's physical condition and neurologic condition were unremarkable. He stated, however, that he could not "totally rule out components of spondylosis from the compression fracture . . . ." (Patnaude Mem., Ex. O at 4). He prescribed Parafon Forte and Ultram for back pain, recommended an epidural steroid injection, and referred Rua to physical therapy.

---

[2] In the interim, Rua filed medical services request forms on December 20, December 27, and December 31, 2008, and January 7 and January 12, 2009. A notation on the January 12 form indicates that Rua was evaluated on January 13 and was aware of the pending neurological appointment. (Original Compl., Ex. G).

[3] Meralgia paresthetica is a numbness or pain in the outer thigh caused by a nerve injury.

[4] Rua filed additional medical service request forms on January 26, January 30, March 2, and April 23, 2009. On March 4, 2009, a nurse referred him to a doctor.

On June 4, 2009, a physical therapist examined Rua and recommended six to eight treatments, with an initial plan for once-per-week treatments for four weeks. However, at his third visit on July 21, 2009, Rua reported that physical therapy was "not helping" and that "it feels worse." (Patnaude Mem., Ex. P at 9). Accordingly, physical therapy treatment was discontinued.

On July 21, 2009, because physical therapy had failed to control his pain, Dr. Geraldine Somers of the Worcester County Jail referred Rua to a pain management center, recommending a transforaminal epidural injection. On August 14, Dr. Cabantong noted that Rua had been practicing five exercises daily without significant relief. He further noted that, although he had previously recommended an epidural steroid injection, Rua had failed to attend the appointment to receive the injection. On November 19, 2009, an MRI of Rua's thoracic and lumbar spine showed mild facet joint arthropathy and mild depression along the superior endplates of L2 to L4 vertebrae but no other abnormalities.

Dr. Patnaude testified that during the course of his treatment of Rua, he has no recollection of ever refusing to see or treat him. (Patnaude Dep. at 51).

## B.     Policies of and Conditions at the Worcester County Jail

On September 1, 1998, Massachusetts abolished county government and all county sheriffs became employees of the Commonwealth. Each sheriff retained administrative and operational control over his or her own office and respective jails.

Guy Glodis served as sheriff of Worcester County from 2004 until 2010. Special Sheriff and Deputy Superintendent Jeffrey Turco supervised the day-to-day operation of the Worcester County Jail.

In 2008, the Worcester County Jail was nationally accredited by the National Commission on Correctional Healthcare and the American Correction Association. Its policies for transportation of inmates, placement of inmates on medical watch, provision of medical care, and staff training met the standards of those organizations. (Glodis Mem., Ex. 5).

On April 29, 2008, the Civil Rights Division of the U.S. Department of Justice issued a report on its investigation of the Worcester County Jail, which included inspections of the facility in February and May 2007. (*See* Rua Mem., Ex. A). The report concluded, in part, that the jail lacked an adequate grievance procedure, in that officials encouraged inmates to communicate their problems informally, failed to enter such communications into the database, stored written forms in an inconvenient location, and imposed additional requirements for filing a written grievance. The report noted that, in response, the jail revised its policies to provide greater access to the grievance system and that grievances increased after those changes. The report further concluded that the jail failed to provide adequate mental health treatment and sometimes lacked adequate documentation of the rationale for placing an inmate on suicide precautions. The report did not make any findings about the jail's transportation policies, its procedures for placing inmates on medical watch, or its medical care generally.

According to the Worcester County Jail Inmate Orientation Book, issued in October 2009, an inmate cannot file a grievance relating to a medical decision, but can file a grievance relating to the denial of medical care. (Rua Mem., Ex. B at 35).

C.    **Procedural Background**

On July 18, August 3, and October 5, 2009, and January 23, March 5, June 9, and October 19, 2010, Rua filed inmate grievances, contending that the medical staff had not

provided adequate and timely treatment for his injuries stemming from the motor vehicle accident. On August 10 and August 19, 2009, respectively, the facility grievance coordinator responded to the first two grievances. The coordinator noted that Rua's medical records documented that he had been receiving medical care and denied the grievance because inmates may not grieve decisions of the medical department, only denial of access to medical care. On October 21, the coordinator denied the October 5 grievance as time-barred but forwarded his concerns to Health Services for review. On February 8, 2010, he denied the January 23 grievance on the same grounds as the July 18 and August 3 grievances. On July 6, he denied the June 9 grievance as unfounded. On October 26, he denied the October 19 grievance as unfounded.

Rua appealed the August 10 decision on February 3, 2010, but the Superintendent denied the appeal as time-barred. His appeal of the February 8 and July 6 decisions and the October 26 decision were denied on March 2 and November 2, 2010, respectively, on the ground that he had not been denied access to medical care.

Rua filed a *pro se* complaint in this Court on December 10, 2010, and an amended complaint on December 12, 2011, against Sheriff Lewis G. Evangelidis, Superintendent Shawn P. Jenkins, Sheriff Guy W. Glodis, and unnamed deputies and security staff and against Kathy Wisniewski, Sue Rogers, Dr. Geraldine Somers, Dr. Thomas Patnaude, Pam Jones, and unnamed medical staff.

On March 18, 2011, this Court referred the case against defendants Somers, Patnaude, Rogers, and Jones to a medical malpractice board pursuant to Mass. Gen. Laws ch. 231, § 60B. On August 16, 2011, the Worcester Superior Court dismissed the medical malpractice claims for

failure to file an offer of proof before the tribunal, and the case was transferred back to this Court.

In October and December 2011, defendants Somers, Jones, Rogers, Evangelidis, and Jenkins separately moved to dismiss, in whole or in part, the claims against them. On June 13, 2012, the Court granted that motion in part and denied it in part, dismissing all claims against Evangelidis and Jenkins. In the same order, the Court referred the medical malpractice claim against Patnaude to a medical malpractice tribunal pursuant to Mass. Gen. Laws ch. 231, § 60B.

On June 25 and 26, 2012, defendants Somers, Jones, and Rogers again moved to dismiss, in whole or in part, the claims against them. On October 3, 2012, the Court dismissed all claims against Somers and Rogers and the medical malpractice claim against Jones.

On February 15, 2013, the Worcester Superior Court held a medical malpractice tribunal as to Rua's claims against Patnaude, during which Rua was represented by counsel. After considering Rua's offer of proof, the tribunal reported that there was not sufficient evidence to raise a legitimate question as to liability for medical negligence. (Patnaude Mem., Ex. V). The case was transferred back to this Court. Rua failed to post the $6,000 bond required by Mass. Gen. Laws ch. 231, § 60B to proceed on a medical malpractice claim. Patnaude moved to dismiss the claims against him, and on September 10, 2013, the Court granted that motion as to the medical malpractice claim.

On October 1, 2013, having secured the assistance of counsel, plaintiff filed an amended complaint against Glodis, Jones, Patnaude, Wisniewski, unnamed deputies, unnamed medical staff, and unnamed security staff. On April 9, 2014, Rua and Jones stipulated to a dismissal of all claims against her. Rua has never effected service on Wisniewski or any of the unnamed

defendants.

On May 20 and May 22, 2014, Glodis and Patnaude, respectively, filed motions for summary judgment.

## II.    <u>Standard of Review</u>

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Essentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009). When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III.    <u>Analysis</u>

### A.    <u>Qualified Immunity</u>

Before proceeding to the merits of plaintiff's claims, the Court first considers whether the defendants are entitled to qualified immunity on the constitutional claims. "Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation

arising out of their performance of discretionary functions." *Bergeron v. Cabral*, 560 F.3d 1, 5

(1st Cir. 2009). The First Circuit has described the test for qualified immunity:

> We use a three-part test to determine whether an official is entitled to qualified immunity, following the guidance provided by the Supreme Court. The threshold inquiry is whether the plaintiff's allegations, if true, establish a constitutional violation. The second question is whether the right was clearly established at the time of the alleged violation. That inquiry is necessary because officers should be on notice that their conduct is unlawful before they are subject to suit. The third is whether a reasonable officer, similarly situated, would understand that the challenged conduct violated that established right.

*Suboh v. District Attorney's Office of Suffolk Dist.*, 298 F.3d 81, 90 (1st Cir. 2002) (internal

citations omitted).

The second prong of the test has been met; it is well-established that "prison officials

have a duty under the 8th and 14th amendments to protect prisoners from violence at the hands

of other prisoners." *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)

(*quoting Leonardo v. Moran*, 611 F.2d 397, 398-99 (1st Cir. 1979)) (internal quotation marks

omitted). The remaining questions are whether plaintiff's allegations, if true, establish a

constitutional violation, and, if so, whether Glodis and Dr. Patnaude should reasonably have

understood that their challenged conduct violated Rua's established rights. For the reasons set

forth below, the Court concludes that plaintiff has not established a constitutional violation. It is

therefore not necessary to reach the third step of the inquiry. Defendants are thus entitled to

summary judgment based on both qualified immunity and the merits of the constitutional claims.

The constitutional claims are addressed below.

### B. Section 1983

Section 1983 "creates a private right of action for redressing abridgements or

deprivations of federal constitutional rights." *McIntosh v. Antonino*, 71 F.2d 29, 33 (1st Cir.

1995). "A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008).

There is no vicarious liability under § 1983. Supervisors may be liable "when their own action or inaction, including a failure to supervise that amounts to gross negligence or deliberate indifference, is a proximate cause of the constitutional violation." *Guzman v. City of Cranston*, 812 F.2d 24, 26 (1st Cir. 1987) (quoting *Lozano v. Smith*, 718 F.2d 756, 768 (5th Cir. 1983)). This encompasses situations where a supervisor "formulates a policy or engages in a practice that leads to a civil rights violation committed by another," and where he has notice of the conditions likely to lead to a deprivation of constitutional rights. *Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir. 1998).

The Eleventh Amendment permits suits under § 1983 for prospective relief against state officials sued in their official capacities, but bars retroactive monetary relief. *Edelman v. Jordan*, 415 U.S. 651, 678 (1974); *Ex parte Young*, 209 U.S. 123, 168 (1908); *see Wang v. New Hampshire Bd. of Registration in Med.*, 55 F.3d 698, 700-01 (1st Cir. 1995). To obtain monetary relief, a plaintiff must sue state officials in their individual capacities. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984).

Here, it is not disputed that defendants are state actors being sued for actions taken pursuant to their official duties. The parties, however, disagree as to whether defendants are liable either directly or in their supervisory capacities.

Also, as an initial matter, the complaint and opposition papers make clear that plaintiff seeks only retroactive, and not prospective, relief from defendants, who are state employees.

Accordingly, the motions for summary judgment will be granted as to all claims to the extent that they are asserted against defendants in their official capacities. *See Kelley v. DiPaola*, 379 F. Supp. 2d 96, 100 (D. Mass. 2005).

An inadvertent or negligent failure to provide adequate medical care by prison staff does not rise to the level of a constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). However, prison officials do violate the Fourteenth Amendment if they exhibit a "deliberate indifference" to a pretrial detainee's serious medical needs. *Feeney v. Corr. Med. Servs.*, 464 F.3d 158, 161-62 (1st Cir. 2006) (citing *Gamble*, 429 U.S. 97, 105-06 (1976)).[5] In order to succeed on a deliberate-indifference claim based on inadequate or delayed medical care, "a plaintiff must satisfy both a subjective and objective inquiry." *Leavitt v. Corr. Med. Servs.*, 645 F.3d 484, 497 (1st Cir. 2011). Subjectively, he must show "that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety." *Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002). "Deliberate" means that the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," while "indifference" means that he must both be aware of the risk and respond unreasonably. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Objectively, plaintiff must establish that the deprivation alleged was "sufficiently serious." *Id.* "The standard encompasses a 'narrow band of conduct': subpar care amounting to negligence or even malpractice does not give rise to a constitutional claim; rather, the treatment provided must have been so inadequate as to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the

---

[5] A "deliberate indifference" claim is based on the Eighth Amendment, which applies against the states through the Fourteenth Amendment.

conscience of mankind.'" *Leavitt*, 645 F.3d at 497 (quoting *Feeney*, 464 F.3d at 162, and *Estelle*, 429 U.S. at 105-06).

Plaintiff contends that Dr. Patnaude exhibited deliberate indifference to his serious medical needs by not providing prompt treatment and by allegedly placing him on suicide watch despite knowing the nature of Rua's injuries and the occurrence of the motor vehicle accident. He further alleges that Dr. Patnaude failed to provide proper supervision of the prison medical staff and allowed the nurses to triage the medical attention request forms.

The evidence demonstrates that Dr. Patnaude was aware, as a subjective matter, of plaintiff's injuries. He testified that he spoke with the nurses soon after Rua's release from Lawrence General Hospital and then formed a treatment plan. However, the record does not demonstrate that he was aware of any risk of serious harm or that he acted unreasonably in response. The initial CT scan and later MRI and x-rays were normal and showed no major abnormalities. Nurses administered the five-day course of ibuprofen prescribed at the hospital, and over the course of the next year, Dr. Patnaude tried multiple, alternative therapies as plaintiff continued to complain of pain. His treatments included multiple medications and referrals to a neurologist, an orthopedist, and a physical therapist. The fact that plaintiff continued to experience discomfort does not indicate that he received inadequate medical treatment.

Plaintiff characterizes the time it took both for his injuries to heal and for him to receive specific treatments as delays of constitutional magnitude. Viewing the evidence in his favor, it is possible that Dr. Patnaude could have acted with greater celerity. He did not evaluate plaintiff in person until one month after the accident, allegedly did not discuss the MRI results with him for more than one month, and did not refer him to a pain management center. According to plaintiff's expert, the "delay in medical treatment," specifically the eight-month delay between

the October 2008 MRI and the referral to a pain management center (by another doctor), "was ill-advised, poorly executed, and worsened the plaintiff's injuries."  (Pomerantz Dep. at 72-73, 76).

At most, however, those delays amount to professional negligence.  "[S]ubstandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation." *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007); *see Ramos v. Patnaude*, 640 F.3d 485, 489-90 (1st Cir. 2011) (granting summary judgment where record showed only "arguable negligence"); *DesRosiers v. Moran*, 949 F.2d 15, 19 (1st Cir. 1991) ("In evaluating the quality of medical care in an institutional setting, courts must fairly weigh the practical constraints facing prison officials.  Moreover, inadvertent failures to provide medical care, even if negligent, do not sink to the level of deliberate indifference." (citations omitted)).

Overall, even under the standard set by plaintiff's expert, the care provided by Dr. Patnaude does not appear constitutionally deficient.  That expert, Dr. George Pomerantz, testified that a doctor faced with a patient with persistent or progressive pain should occasionally re-evaluate the treatment plan.  (Pomerantz Dep. at 73, 76).  Dr. Patnaude did so here, varying plaintiff's medications and referring him to various specialists.  Dr. Pomerantz also stated that referring a patient with meralgia paresthetica to a neurologist would be appropriate.  (Pomerantz Dep. at 66).  Dr. Patnaude made such a referral in December 2009.  Ultimately, Dr. Pomerantz offered no opinion as to whether Dr. Patnaude was negligent or deliberately indifferent. (Pomerantz Dep. at 69-71).  His opinion therefore provides little support in opposition to

summary judgment.[6]

There is a disputed question of fact as to whether nurses placed plaintiff on medical watch or suicide watch. The balance of evidence weighs heavily in favor of the conclusion that Rua was placed on medical watch. All of the available records indicate that plaintiff was on medical watch; the sole contrary piece of evidence is plaintiff's own testimony. Yet even plaintiff's opposition seems to express uncertainty as to what transpired. It states that "Suicide watch and Med watch are both located in Cell Block A-1 so it is *not a stretch of the imagination* that plaintiff could have been placed in the much more punitive suicide watch" and "[i]f this is indeed the case it is arguable that Rua's treatment immediately after the accident is arbitrary punishment . . . ." (*See* Pl. Mem. at 23) (emphasis added).

More importantly, the distinction between medical watch and suicide watch is not material under the circumstances. Even assuming that plaintiff was held on suicide watch, the record contains no indication that Dr. Patnaude knew that fact. Dr. Patnaude therefore lacked the subjective state of mind required to prove deliberate indifference.

Plaintiff stresses that summary judgment is inappropriate because there is a question of mental state, urging that a factfinder could infer deliberate indifference from the facts presented. It is true that questions of intent or mental state generally present questions of fact and that courts should be cautious in deciding such an issue on summary judgment. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 928-29 (1st Cir. 1983). However, "the presence of issues involving state of mind, intent, or motivation does not automatically preclude

---

[6] In his reply memorandum, Dr. Patnaude suggests that he questions the qualifications of Dr. Pomerantz or the basis for his opinion. (*See* Patnaude Reply at 3). While there may be grounds to do so, no motion to preclude his opinion has been filed. The Court will therefore accept the qualifications of Dr. Pomerantz and the basis for his opinion for the purposes of the present motions.

summary judgment." *Id.* at 929. "[A] party against whom summary judgment is sought is [not] entitled to a trial simply because he has asserted a cause of action to which state of mind is a material element." *Hahn v. Sargent*, 523 F.2d 461, 468 (1st Cir. 1975). Where, as here, "there is no evidence of treatment so inadequate as to shock the conscience, let alone that any deficiency was intentional, or evidence of acts or omissions so dangerous (in respect to health or safety) that a defendant's knowledge of a large risk can be inferred, summary judgment is appropriate." *Torraco v. Maloney*, 923 F.2d 231, 234 (1st Cir. 1991) (internal quotation marks and citations omitted).

As for liability on the basis of a failure-to-supervise or failure-to-train theory, the evidence here falls far short of establishing a viable claim. Plaintiff is required to specify the ways in which the training received by the medical staff was "inadequate" and demonstrate that it was "inferior by the standards of the profession." *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir.1989) (citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1160 (1st Cir. 1989)). He has not done so. Moreover, "[a] generalized showing of a deficient training program is not sufficient. The plaintiff must establish that the particular officers who committed the violation had been deprived of adequate training, and that this specific failure in training was at least a partial cause of the ultimate injury." *Whitfield*, 431 F.3d at 9-10 (citing *Young v. City of Providence*, 404 F.3d 4, 26 (1st Cir. 2005)). The mere fact that an injury occurred is insufficient to establish failure to train and supervise. Likewise, the fact that a subordinate may have done something wrong is insufficient. As the Supreme Court has explained, "plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [defendant] liable . . . . [O]fficers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar

circumstances." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989). Here, the record provides no evidence to support the suggestion that Dr. Patnaude knew that the medical staff was providing improper treatment to or failing to triage incarcerated patients, that he failed to supervise them in an appropriate manner, or that he failed to provide adequate training.

As to the claim against Glodis, plaintiff contends that the former sheriff failed to provide adequate medical and grievance procedures in the prison and possibly suggests that he failed to provide adequate policies for transportation of inmates or placement on medical or suicide watch. There is no evidence that Glodis was involved with medical care or transportation at the jail, either generally or specifically relating to plaintiff. Nor is there evidence that he knew that the medical care and procedures or the transportation services were generally inadequate. The Department of Justice report took issue with certain conditions at the Worcester County Jail, including the placement of mentally ill patients on suicide watch. But it did not question the conduct of prison transportation, placement of physically ill patients on medical or suicide watch, or the standards of medical care as a general matter.

Plaintiff has therefore not presented "the requisite quantum of evidence" to demonstrate that Glodis knew of any conditions that would place plaintiff at substantial risk of serious harm or of any related failure to train or supervise on Glodis's part. *Hahn v. Sargent*, 523 F.2d at 468. Nor has he shown that Glodis was aware of facts that suggested such a risk of harm and in fact drew the inference that harm would result. *See Leavitt*, 645 F.3d at 502. A supervisor cannot, of course, avoid liability through willful blindness. But it does not appear that the medical care or other treatment plaintiff received was deficient as a constitutional matter.

Finally, plaintiff has not specified which particular officers Glodis failed to train or supervise and how that failure caused, at least in part, his specific injuries. *See Whitfield*, 431

F.3d at 9-10.

Accordingly, the motions for summary judgment will be granted as to the claims under § 1983 alleging violation of the Fourteenth Amendment.[7]

**B.      Section 1985**

Plaintiff next contends that the defendants, acting in concert, violated 42 U.S.C. § 1985 by placing him on suicide watch, and denying him medical care to cause him to endure pain, in retaliation for his requests for and complaints about medical treatment and in order to limit medical expenses.  (*See* Compl. ¶¶ 40-41).  He does not specifically state under which of the three subsections of § 1985 he asserts his claim, either in the complaint or in his opposition papers.  Indeed, the opposition papers make no mention whatsoever of § 1985.[8]

Section 1985 prohibits conspiracy to interfere with civil rights by (1) preventing an officer from performing his or her duties, (2) obstructing justice by intimidating a party, witness, or juror, or (3) depriving a person of his or her legal rights or privileges.  42 U.S.C. § 1985.

---

[7] In his opposition papers, plaintiff also invokes the Fourteenth Amendment to allege a lack of due process in two respects.  First, he challenges his alleged placement on suicide watch in the aftermath of the motor vehicle accident, a placement which he contends was unlawful pre-trial punishment.  Second, he raises questions about an alleged insubordination charge that led to a hearing and resulted in his placement in solitary confinement.

As noted, it is a disputed question of fact whether plaintiff was placed on suicide watch.  But even assuming that he was, he has presented no evidence that either Glodis or Dr. Patnaude knew of such confinement.  They deny having such knowledge, and the official records of the prison indicate that plaintiff was held on medical watch.  Thus, even if Glodis or Dr. Patnaude reviewed the official prison records, they would not have learned of the possibility that Rua had been placed on suicide watch. A party cannot rely on bare allegations to survive a summary judgment motion, but instead must present affirmative evidence.  *Ruiz-Rosa v. Rullan*, 485 F.3d 150, 156 (1st Cir. 2007).  Such evidence is lacking here.

Moreover, the claims under § 1983 as presented in the complaint focus solely on denial of medical treatment amounting to deliberate indifference.  The complaint makes no mention of denial of procedural due process relating to placement on suicide watch or the February 2009 solitary confinement.  Plaintiff had the opportunity to amend his complaint, and in fact did amend it, twice.  Although he may seek leave to do so at any time, he cannot do so through opposition papers.  Having been denied proper notice, defendants need not be held to answer for those claims now.

[8] Plaintiff's failure to brief the issue is itself an independent ground on which to grant summary judgment.

Faced with no allegations that could remotely fit within the first two subsections, the Court presumes that plaintiff seeks to assert a claim under the third subsection.

A claim under § 1985(3) requires proof of (1) a conspiracy; (2) "a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws"; (3) "an overt act in furtherance of the conspiracy"; and (4) "injury to person or property, or a deprivation of a constitutionally protected right." *Perez-Sanchez v. Pub. Bldg. Auth.*, 531 F.3d 104, 107 (1st Cir. 2008) (citing *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)). The second element, relating to deprivation of equal protection, requires that there be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

Evidence of discrimination on the basis of race, class, or other category is entirely lacking here. Not only does the record not support such a finding, but the complaint also fails to allege it. Furthermore, although plaintiff notes that Sheriff Glodis and Dr. Patnaude did have offices near one another and did talk to one another periodically, there is no evidence of any agreement between them.

Accordingly, the motions for summary judgment will be granted as to the § 1985 claim.

### C.    Breach of Fiduciary Duty

Next, the complaint asserts a claim for breach of fiduciary duty for alleged failure or refusal to provide medical care to plaintiff. The complaint does not specify which defendants committed the alleged breach, and plaintiff's opposition fails to address the claim at all.[9] The absence of affirmative evidence at this stage could, alone, warrant summary judgment.

---

[9] Again, plaintiff's failure to brief the issue constitutes an independent ground for granting summary judgment.

However, an examination of the claim on the merits also demonstrates that summary judgment is appropriate.

Dr. Patnaude had a duty to plaintiff that arose out of their doctor-patient relationship. A breach of that duty would typically constitute a claim for medical negligence. However, this Court dismissed the medical negligence claims against Dr. Patnaude, and plaintiff cannot pursue that theory now merely by attaching a different label to it.[10]

As for Glodis, it is not clear what duty to plaintiff he had or how he breached it. His relationship with Rua, to the extent any existed, does not fall within the "many familiar and well recognized forms of fiduciary relationships" under Massachusetts law. *See Korper v. Weinstein*, 57 Mass. App. Ct. 433, 437-38 (Mass. App. Ct. 2003) (citing *Warsofsky v. Sherman*, 326 Mass. 290, 292 (1950) for the proposition that the common fiduciary relationships are between "attorney and client, trustee and beneficiary, physician and patient, business partners, promotors or directors and a corporation, and employer and employee"). Fiduciary relationships are not limited to these familiar examples, but the existence of a fiduciary duty outside of these relationships "is to be determined by the facts established." *Warsofsky*, 326 Mass. at 292-93. Rua has alleged no specific facts that could establish the existence of a fiduciary duty on the part of Glodis. There is no genuine issue of fact on this point.

Accordingly, the motions for summary judgment will be granted as to the claims for breach of fiduciary duty.

---

[10] It also appears that Dr. Patnaude is a public employee who is immune from negligence suits under the Massachusetts Torts Claims Act, Mass. Gen. Laws ch. 258 § 2; *see McNamara v. Honeyman*, 406 Mass. 43, 46-48 (1989). Plaintiff failed to comply with the pre-suit requirements of the MTCA to bring a negligence claim against the Commonwealth. *See* Mass. Gen. Laws ch. 258 § 4; *Schenker v. Binns*, 18 Mass. App. Ct. 404, 405 (1984).

### D.      Intentional Infliction of Emotional Distress

Next, the complaint alleges intentional infliction of emotional distress ("IIED").  To establish such a claim, a plaintiff must show that (1) a defendant either intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous; (3) the conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe and of a nature that no reasonable person could be expected to endure.  *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976).

Conduct is "extreme and outrageous" if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Foley v. Polaroid Corp.*, 400 Mass. 82, 99 (1987).  That standard may require more than is necessary to state a claim under § 1983.  *See, e.g.*, *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 319 (D. Mass. 1997) ("[T]he mere fact that the defendants' conduct may turn out to be violative of the plaintiff['s] civil rights does not . . . necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress.").

As set forth above, the available evidence fails to demonstrate that Glodis and Dr. Patnaude knew or should have known that any serious harm would befall plaintiff.[11]  They therefore could not have acted in the targeted and malicious manner that is required to meet the high bar for an IIED claim.  *See Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996).  Accordingly, the motions for summary judgment will be granted as to the IIED claims.

---

[11] Indeed Glodis contends, and plaintiff has failed to dispute, that he had no knowledge of plaintiff prior to his filing suit.  (Glodis Dep. at 14, 55).

### E.     Claims Against Kathy Wisniewski and the Unnamed Defendants

The initial complaint included as defendants Kathy Wisniewski, former Medical Department Director at Worcester County Jail, and unnamed medical and security staff. The second amended complaint likewise included Wisniewski, unnamed medical staff, and unnamed security staff, as well as unnamed deputies.

Under Fed. R. Civ. P. 4(m), a district court may dismiss a complaint without prejudice as to a particular defendant if the plaintiff fails to serve him within 120 days after filing the complaint. "Moreover, a district court otherwise prepared to act on dispositive motions is not obligated to 'wait indefinitely for [the plaintiff] to take steps to identify and serve . . . unknown defendants.'" *Figueroa v. Rivera*, 147 F.3d 77, 83 (1st Cir. 1998) (quoting *Glaros v. Perse*, 628 F.2d 679, 685 (1st Cir.1980)) (upholding dismissal of defendants after seventeen-month lapse).

In the nearly four years that this case has been pending, it does not appear that plaintiff ever served Wisniewski or made any attempts to identify, name, or serve the unnamed parties. Accordingly, the Court will dismiss the case without prejudice against Wisniewski and the unnamed defendants.

### IV.     Conclusion

For the foregoing reasons, the motions of defendants Thomas Patnaude, M.D., and Guy W. Glodis are GRANTED. The case is DISMISSED without prejudice as to defendant Wisniewski and the unnamed defendants.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 24, 2014